**W. E. ANDERSON SONS COMPANY, Appellant, v. GLANDER, Tax Commr., Appellee.**

Board of Tax Appeals.

No. 16188.   Decided April 11, 1950.

Richard V. Willcox, Dargusch, Caren, Greek & King, by Darold I. Greek, Columbus, for appellant.

Hon. Herbert S. Duffy, Atty. Genl., W. H. Annat, Asst. Atty. Genl., Columbus, for appellee.

### ENTRY

This is an appeal from a final order of the Tax Commissioner under date of April 20, 1949, wherein a sales and use tax adjusted assessment, covering an audit period from January 1, 1943, to December 31, 1946, was made in the following sums:

|  | ASSESSMENT | PENALTY | TOTAL |
|---|---|---|---|
| Sales | $5,968.90 | $298.45 | $6,267.35 |
|  | 84.91 | 4.25 | 89.16 |
|  | Total sales and use taxes _____ | | $6,356.51 |

The complaint of the taxpayer is now before the Board of Tax Appeals upon the notice of appeal, the Tax Commissioner's transcript, the record of evidence had before a member of this Board on November 17, 1948, and January 4, 1950, and briefs of counsel. The following appears as Item 2 within a stipulation of facts (pages 64 and 65 of the record):

"The appellant does not contest the use tax amounting to $84.91 and does not contest the sales tax assessed on items other than (a) dump trucks and repair parts for dump trucks, and (b) truck chassis upon which concrete mixers are mounted and repair parts for such chassis. The amount of sales tax upon the purchase or use of such other items is $330.21, making a total of sales and use tax not contested of $415.12. The balance of the assessment consists of sales tax and amounts to $5,638.69 and said amount is the total amount assessed upon dump trucks and repair parts therefor and truck chassis upon which concrete mixers are mounted and repair parts therefor, and is the amount in issue before the Board of Tax Appeals."

It is further agreed in Items 3, 4, 5 and 6 of the stipulation that the sales and use tax upon the purchase of truck chassis upon which concrete mixers are mounted and repair parts thereof amount to the following:

For the year 1943 _____ $  289.82
   „    „    „   1944 _____    390.69
   „    „    „   1945 _____  1,061.84
   „    „    „   1946 _____  1,092.12

and that the like total tax on dump trucks and repair parts is:

For the year 1943 _____ $  289.82
   „    „    „   1944 _____    390.69
   „    „    „   1945 _____  1,061.84
   „    „    „   1946 _____  1,061.87

Item 5 recites that:

"The respective percentages of the time that the dump trucks were used in transporting materials owned by appellant and in transporting materials owned by others for the years in question were as follows:

| % of Time Hauling for Others | % of Time Hauling Appellant's Materials |
| --- | --- |
| 1943 _____ 90.1 | 9.9 |
| 1944 _____ 47.0 | 53.0 |
| 1945 _____ 31.8 | 68.2 |
| 1946 _____ 33.7 | 66.3 |

Like figures for truck chassis upon which concrete mixtures were mounted are, as shown in Item 6:

| % of Time Hauling for Others | % of Time Hauling Appellant's Materials |
| --- | --- |
| 1943 _____ 3 | 97 |
| 1944 _____ 3 | 97 |
| 1945 _____ 3 | 97 |
| 1946 _____ 3 | 97 |

It is agreed that while hauling for others appellant was engaged in rendering a public utility service under the jurisdiction of the corresponding State agency. Two other agreed facts appear. The purchase and use of the concrete mixers and their repair parts were not assessed; and that in computing the assessment the Tax Commissioner did not levy an assessment against that portion of the cost of appellant's purchases which are represented by the percentage figures shown under the column "% of Time Hauling for Others"

for the reason that it was considered that such use was directly made in the rendition of a public utility service. It is, therefore, apparent that the percentage assessment as made is based upon that proportion of the use as appears under the column of "% of Time Hauling Appellant's Materials," which is susceptible of a further breakdown into three parts.

The major query presented in this assessment and appeal concerns the taxpayer's claim of nontaxability of the chassis and repairs therefor upon which the concrete mixers are mounted. This right to exception is predicated upon three grounds. First, that it was the purpose of the consumer, when purchased, to use or consume them directly in the production of tangible personal property for sale by manufacturing or processing. Second, it was also the purpose, at time of purchase, to use or consume them directly in making retail sales. In stating appellant's third ground, we quote from its brief:

"If the Tax Commissioner excludes from the tax purchases of materials used as a base for machinery which may be purchased without payment of tax when such base is stationary, because the base is considered to be a part of the machinery, can he, without discrimination and without denying equal protection of the law, assess a tax on a movable base for machinery which is used directly in the production of tangible personal property and which can be purchased without payment of tax?"

It is apparent that the first two grounds of appellant's complaint are hinged upon the words "the purpose of the purchaser" as they appear in §5546-1 GC to establish the exception of its purchase of truck chassis and repair parts from all other articles of tangible personal property that are taxable when sold at retail. The applicable portion of this statute reads:

" 'Retail sale' and 'sales at retail' include all sales excepting those in which the purpose of the purchaser is (a) * * *; or (b) * * * to use or consume the thing transferred directly in the production of tangible personal property for sale by manufacturing, processing * * *; or directly in making retail sales * * *."

If sales taxation is dependent solely on one's declared purpose at time of purchase, tax evasion is a simple matter to

him who is so inclined; and his circumvention of the law's purpose can only be corrected by departmental audit, which, if necessary in every case, would create such a stupendous task that the law could not be uniformly enforced. Taxation of retail sales is not dependent upon a purchaser's interpretation of the law's terms, or avoidable by the purchaser's declared purpose. That purpose may undergo future quick change, or such property may be used or consumed in a manner that is not directly creative of tangible personal property for sale by manufacturing or processing, or directly in making retail sales. The statute not only presupposes that an article is proposed to be used for an excepted use, but that it will actually be used for an excepted purpose. These observations produce the simple query: Were the truck chassis so used?

Appellant's principal business is the manufacturing and sale of concrete mix at retail and wholesale. This is practically the exclusive use to which the truck chassis, upon which the cement mixers are fixed, are put. Their use in public utility service is here of no concern. The following operative facts are contained within the record. There are three methods of manufacturing and selling mixed concrete; (1) central-mix, where the concrete is manufactured at a central plant and then transported to the job site; (2) job-site manufacturing by mixers located at the job site; and (3) transit-mix, where the ingredients are loaded in mixers mounted on truck chassis and manufactured en route to the job site. This third method is said by appellant to be "the more convenient, economical and efficient manufacturing method followed by appellant in the use of his machinery," and that it is penalized by the Commissioner's order "for using a better mouse trap." Appellant is engaged exclusively in the third type of manufacture. Its production begins when ingredients and aggregates enter the mixers from bins in appellant's yards. It is claimed to end at job site upon delivery. As we understand the process, when aggregates and cement go into a mixer they are then being and continue to be revolved until the ingredients are thoroughly mixed. Then water in the amount required is added to make the sump, its liquid consistency, such as is desired in the yard. The distance to be covered to job site is important, as concrete begins to set in one and a half to two hours. The mixer continues to revolve throughout transit. Drivers are skilled. They must add water in transit, if needed, or at the job site if the purchaser requires that the mixture be thinned. No independent charge is made for

delivery. All factors, like character and quantity of ingredients, distance of delivery point, road conditions en route and at point of delivery, and manner of delivery, and other usual elements of cost of production are considered in fixing sales price, which varies accordingly. Appellant retains title until delivery is made. A purchaser may reject any mixer load at delivery point if the concrete is unacceptable for any valid reason. Green concrete is said to be perishable.

Truck chassis for transit concrete mix are specially built. They are approximately 5000 pounds heavier than ordinary industrial chassis. They are seldom used for other purposes because the extra weight reduces the pay load and the resale value is said to be low. These truck chassis have specialized mechanical parts such as tandem driven axles, dual frames, larger springs on the right side to equalize the load of the mixer's concrete from left to right, larger transmission, larger clutch, larger tires with mud and snow gripping tire tread, longer wheel base, and a larger battery and generator which have at times within the audit period been purchased independently of truck chassis equipment.

The cement mixer is operated by a gasoline motor which is attached to and is a part thereof. It causes the mixer to revolve independently of the truck chassis mechanism with a single exception, that being that the mixer's gasoline motor is started in action by the use of the truck chassis battery and generator in the yards when the ingredients are first begun to be mixed. The truck chassis plays no further part in the manufacture of concrete save that of transporting the mixer and its contents to the point of delivery. Is the truck chassis used in the manufacture of concrete?

From the related facts it is clear that the truck chassis plays two parts in the operation of the manufacture and sale of concrete. First, it starts the mixer motor which actually begins the process of transit-mix manufacture of concrete. Second, it transports the mixer and its contents to the job site. In our search for superior direction, the case of **Kroger Grocery & Baking Co., v. Glander, 149 Oh St 120 (132)** may safely be disregarded because of the statement therein found that "transportation itself is not involved in this record." We feel that the answer may be found in the recent case of **Asphalt Corp. v. Glander, 152 Oh St 497,** which reviews the four earlier cases of **Saunders Mills, Inc. v. Evatt, 139 Oh St 227; France Co. v. Evatt, 143 Oh St 455; Dye Coal Co. v. Evatt, 144 Oh St 233,** and **Fyr-Fyter Co. v. Glander, 150 Oh St 118.** Appellant states that "the truck chassis were the key to ap-

pellant's operations" and without them it could not carry on its business. Such statements are undoubtedly true. But is that the test of exceptability? Judge Stewart, speaking for the court in the Asphalt Corp. case, supra, says, on page 501 thereof, that:

"When the General Assembly excepted from taxation the sales of those things which were to be used or consumed directly in the production of tangible personal property for sale by processing, it 'had in mind only such articles as had a direct part in the processing. Sales of instrumentalities of transportation and other articles or things which are necessary to carry on the business of processing, but which themselves have no part directly in the production, were not excepted."

As the Board views the facts, the truck chassis battery and generator only put in motion the mixer's gas motor which begins the first step in the production of concrete. It plays no further part therein other than to transport the mixer and its load to the point of delivery. In Asphalt Corp., supra, a crane was involved. It was recognized as necessary and indispensable to the taxpayer's business, but, as said on page 502, it

"* * * was not engaged in converting the ingredients into a processed product" but used in bringing materials to the place where processing began.

But it is further maintained that it is unfair and discrimatory to except or exempt an immovable base from taxation when the instrumentality which it supports is tax free, and to tax a movable base when the article which it carries is excepted from taxation. An assistant to the Tax Commissioner states it has been the departmental practice not to tax stationary bases when that which it supports is excepted from taxation. He further states that such practice has never been applied to mobile bases. No rule of the Tax Commissioner is directly complained of although we are referred to the Tax Commissioner's Rule No. 44 which, in part, relates to taxability of vehicles used for delivery purposes, and Rule No. 39 which relates to taxation of personalty used in administration, production and distribution of goods manufactured for sale. In stationary bases no question of transportation is involved. In the present controversy this Board does not have before it any question of the propriety of the Commissioner's practice with respect to immovable bases. Appel-

lant places considerable reliance upon that portion of the court's opinion in Tri-State Asphalt Corp. v. Glander, supra, which reads:

"* * * if such instrumentalities are used solely to transport partially processed materials to another location where the processing is continued or completed by the same processor, they are used directly in the production of the processed property."

It is, of course, appellant's position that its manufacture of concrete is a continuous process of operation to the point of delivery. We think that it may be more properly said that the concrete is actually made in its yard. Its continuous agitation simply keeps it from setting; and the addition of water, when and if needed, simply changes its liquid consistency and not its substance. It must further be observed that the facts of the Asphalt case, supra, are not parallel to the facts here presented, and from the rest of the court's reasoning therein such would not have been said in a case like the present one.

The Board feels that in view of the claims herein made that it ought to be pointed out that during practically half of the truck chassis operation—that is, on its return trips—it is transporting the cement mixer back to the appellant's yards when it is definitely not engaged in manufacturing and delivering concrete for sale. Its return to the yard is something more than the return of a delivery truck for another load.

Another of appellant's contentions is that the truck chassis are "used directly in making retail sales" and, therefore, the purchases of said truck chassis are excluded from the definition of "retail sale" as that term is used in §5546-1 GC. The evidence herein indicates that about 50% of appellant's sales of transit mixed concrete were for resale and about 50% of said sales were "retail sales" or sales to persons who did not buy for resale; that the concrete is placed where the purchaser specifies and in many instances is spread or dumped in small quantities in several designated spots; that the cost of transporting the concrete is added directly to the price of the concrete being sold so that in all cases the cost of this service is included as a part of the selling price of the materials.

Appellant argues that the sale of the transit mixed concrete does not occur until delivery is made to the place or places indicated by the purchaser. As to this argument it might

here be pointed out that the transit mix is delivered, in each instance, following an agreement or contract previously entered into between the appellant and the purchaser, and no sales are made from the truck on a door to door solicitation basis; in other words, the truck chassis is used by the appellant to deliver merchandise already on order by the purchaser.

And it might further be observed that the Board of Tax Appeals fails to see how the truck chassis could be said to be used directly in making "retail sales" on the distinction of having the delivery cost computed separately on each sale and delivery of transit mixed concrete, rather than having all delivery costs averaged and included in the total price collected from each individual purchaser. In either instance the truck chassis would be performing the same function. The function of the truck chassis in delivering the concrete to the purchaser is, in effect, no different from the function a delivery truck performs when it is used to transport any article of tangible personal property to the home or office of a purchaser following the receipt of an order therefor.

Appellant also contends that the term "retail sale," as used in §5546-1 GC, should be given a liberal construction in favor of the taxpayer in accordance with certain pronouncements contained within tax cases decided by the Supreme Court of Ohio. (See Kroger Grocery & Baking Company v. Glander, supra, and Bailey v. Evatt, 142 Oh St 616.)

In this connection it might be pointed out that §5546-2 GC, among other things, provides that:

"For the purpose of the proper administration of this act and to prevent the evasion of the tax hereby levied, it shall be presumed that all sales made in this state are subject to the tax hereby levied until the contrary is established."

It is also noted that the law of Ohio relating to exemptions and exceptions, as enunciated in the third syllabus in the case of The Cleveland Cliffs Iron Company v. Glander, 145 Oh St at page 424, reads as follows:

"The provision of any statute which purports to except certain property from general provisions governing taxation is a measure of exemption, and laws relating to exemption of property from taxation being in derogation of equal rights are strictly construed."

Inasmuch as the Board has found that the truck chassis

plays no part in the processing of concrete other than transportation of the mixer and its load, and is not directly used in the making of retail sales, we perceive no other course than to follow the mandate of the Asphalt Corp. case, supra, as hereinbefore set forth. The Tax Commissioner did not err in holding the truck chassis to be taxable items.

The secondary question concerns the exceptability of purchases of dump trucks and repair parts therefor from taxation during the percentage of time of use in hauling appellant's materials. Appellant contends that it had two purposes in their purchase. First, a primary one of using and consuming them directly in the rendition of a public utility service and second, a use and consumption directly in making retail sales; and that either one or both of which were sufficient reasons for excluding such purchases from imposition of a tax. Which is to say that substantial use in part for such purposes is sufficient to warrant total exclusion. The answer to this theory of purpose must be the same as heretofore stated concerning truck chassis. The Tax Commissioner takes the view that in hauling its own materials the dump trucks are nothing more than delivery trucks for the transportation of said gravel and other aggregates, dirt, and bituminous concrete; when it sells its products it takes into account all cost factors in arriving at selling price, including delivery, as in the sale and delivery of its transit mixed concrete; that it retains title to its goods until it makes delivery, and that it makes no separate charge for delivery. As previously noted, this activity may be broken down into three parts. (1) In hauling aggregates and ingredients to appellant's smaller yards. Appellant minimizes this branch of its business, but recognizes that such use percentage is clearly not excludable, but a taxable item. (2) In hauling aggregates, blacktop to others for resale. (3) In hauling aggregates, blacktop and other ingredients to a consumer purchaser for use. The Board is invited to contrast that situation where "delivery is a matter of convenience to the customer and is not necessarily a condition of sale" and "the price of the item is constant and does not vary depending upon whether delivery is at the store or at the customer's home" with the instant facts where "the delivery costs are passed directly and immediately on to the consumer by way of higher prices for the materials sold." Which is to say that because the cost of delivery is concealed in a portion of the selling price, its dump trucks are exceptable items not subject to sales taxation.

It does not require an overly astute individual to be cognizant of the fact that concerns selling articles at a fixed price with free delivery service within a fixed area figure in as a part of the item's sales price the average cost of delivery and for which all purchasers pay whether they accept delivery at a store or at their homes. In both instances cost of delivery is concealed within sales price. The argument is ingenious, but hardly convincing. Here again necessity is urged in support of appellant's claim. The answer is the same as heretofore made concerning truck chassis. We find no exception within the statute involved excluding articles used in delivery service in any of the three ways that these dump trucks are used. It is the Board's judgment that the Tax Commissioner did not err respecting the proportional assessment of the dump trucks. The order appealed from may be and is affirmed.

I hereby certify the foregoing to be a true and correct copy of the action of the Board of Tax Appeals of the Department of Taxation this day taken with respect to the above matter.

JOSEPH D. BRYAN
Secretary